898 F.2d 148
 30 Fed. R. Evid. Serv. 550
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
George HARRIS, a/k/a G, a/k/a Mr. G, a/k/a George,
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Crystal Powell HARRIS, a/k/a Crystal Powell, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carolyn Lee PATTERSON, a/k/a Crystal's Mother, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Fencel O'Hara MARTIN, a/k/a Festus, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gigi Long FREEMAN, a/k/a Gigi, a/k/a Lee Long, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Johney FREEMAN, a/k/a Johnny, a/k/a Mr. J, a/k/a J,
Defendant-Appellant.
 Nos. 88-5663 to 88-5667 and 88-5691.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 6, 1989.
Decided: Feb. 26, 1990.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. J. Calvitt Clarke, Jr., District Judge. (CR-88-76-N)
 Douglas Fredericks; John Venner (Culverhouse & Miller on brief); Paul Ray (Raymond A. Carpenter, Jr., Boone, Carpenter, Beale, Cosby & Hyder; Eileen A. Olds; Howard M. Miller, St. Clair & Miller, P.C., on brief), for appellants.
 Robert Joseph Seidel, Jr., Assistant United States Attorney (Henry E. Hudson, United States Attorney; Robert E. Bradenham, III, Assistant United States Attorney; Harvey L. Bryant, III, Assistant United States Attorney; Charles D. Griffith, Jr., Assistant United States Attorney, on brief), for appellee.
 E.D.Va.
 AFFIRMED.
 Before DONALD RUSSELL and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.[1]
 PHILLIPS, Circuit Judge:
 
 
 1
 Defendants in this case appeal various aspects of their convictions under 21 U.S.C. Sec. 846 (conspiracy and attempt to distribute narcotics), 21 U.S.C. Sec. 848 (continuing criminal enterprise), 21 U.S.C. Sec. 841(a)(1) (distribution and possession with intent to distribute narcotics), and 21 U.S.C. Sec. 2 (aiding and abetting). Additionally, various defendants appeal the district court's imposition of sentences under the Sentencing Guidelines.
 
 
 2
 * From the summer of 1984 until the end of October of that year George Harris, Johney Freeman, and Roland Scott Harvey brought approximately a pound and a half of high purity, eighty to ninety percent, cocaine from New York into the Norfolk area every four days. This cocaine was distributed from the apartment of George Harris' wife, Crystal Harris. The operation had regular business hours, salaried employees, and restricted access employing extraordinary security with armed guards who carried shotguns and loaded pistols. George Harris and Johney Freeman had hired security guards, outfitted with walkie-talkie radios, to be on the lookout for law enforcement officials or individuals attempting to rob the premises of its daily cash receipts or cocaine stash. They equipped the apartment with a police scanner to monitor police radio frequencies and floodlights to provide added security from the rear.
 
 
 3
 Evidence adduced at trial revealed the following chain of command. George Harris acted as chief executive officer, exercising overall control over the group, while Johney Freeman managed and supervised day-to-day operations during George Harris' absences. Crystal Harris acted as the secretary-treasurer, provided money to start the business, and set up checking accounts to handle the funds. Fencel Martin (Martin) was an insider who handled cocaine sales from the premises frequently armed with a revolver. Carolyn Patterson (Patterson) maintained a residence which the organization used for storing cocaine and money. Later in 1986 Patterson delivered cocaine and received payments from the organization. Gigi Long Freeman (Gigi), the wife of Johney Freeman, lived at the main headquarters for a period of time and later transported cocaine on at least three occasions from the New York area to Norfolk.
 
 
 4
 The cocaine business continued until June of 1985 when execution of four state search warrants led to the arrest of the eleven co-conspirators. Roland Scott Harvey, one of the conspirators, testified publicly under oath subject to cross-examination at a state court preliminary hearing against defendants Crystal Harris, Johney Freeman, Fencel Martin and Carolyn Patterson. These four defendants were present at the preliminary hearing. Witnesses in the ensuing trial testified to a conversation in which "Mike," Roland Scott Harvey's assassin, discussed how he and Freeman had killed Harvey and received $10,000 for doing the murder. On May 26, 1986, Johney Freeman returned to the Norfolk, Virginia, area with "Mike" and directed one of his colleagues to purchase a firearm so that "Mike" could murder yet another witness. On the night of May 26, "Mike" shot the witness six times with a .357 Magnum causing instant death. Finally, on August 20, 1986, the final victim was murdered. Evidence at trial suggested that either Harris or Freeman arranged this murder.
 
 
 5
 From jury conviction on the charges above identified, these appeals were taken.
 
 II
 
 6
 We first address those issues asserted as error by all six defendants, then proceed to examine errors asserted by individual defendants.
 
 
 7
 * The defendants argue that the trial court erroneously refused defendants' motion for a mistrial. The basis for the asserted error is that, two weeks into the trial, a defense witness, responding to the prosecutor's questioning, testified that Fencel Martin had earlier been convicted in Virginia state court for activities involving the very same conspiracy for which he was on trial in federal court. The court instructed the jury to disregard the answer, but the defendants argue that prejudice resulting from the witness' answer required a mistrial, and at this point a new trial.
 
 
 8
 The question concerning Fencel Martin's prior conviction involving the same conspiracy was an improper one under Fed.R.Evid. 403 and 404(b) and constituted error. See United States v. Nichols, 781 F.2d 483, 485 (5th Cir.1986).
 
 
 9
 Where non-constitutional error is involved, the proper test of harmlessness is whether, on appellate review, this court can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Urbanik, 801 F.2d 692, 698 (4th Cir.1986) (quoting Kotteakos v. United States, 329 U.S. 750, 765 (1946)). In applying this test, we must ask whether it is "highly probable that the error did not affect the judgment." Id. at 699 (quoting United States v. Nyman, 649 F.2d 208, 212 (4th Cir.1980)). A proper assessment requires that we consider the "closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." Id. (quoting Nyman, 649 F.2d at 212).
 
 
 10
 Here, of course, the issue of the conspiracy's existence was central to the case. Nevertheless, the district court took steps to mitigate the prosecutor's error by refusing to admit the proffered testimony, by giving a cautionary instruction to the jury to disregard the question and answer, and finally by offering the defendant a chance to poll the jury.[2] In addition to this curative instruction, there was an absolutely overwhelming amount of evidence establishing the existence of the conspiracy. In short, this was not a close case. Cf. United States v. Morrow, 731 F.2d 233, 235 n. 4 (4th Cir.1984) (evidence of prior confinement harmless because its effect was "tenuous at best[,] a mere superfluity" in light of the evidence against the defendant). The question was asked near the end of a two-week long trial in which no fewer than eleven witnesses had testified concerning the extent and activities of the conspiracy. We simply cannot say that the error "substantially swayed" the judgment. Urbanik, 801 F.2d at 698. Accordingly, we find that the improper question constituted harmless error that does not warrant awarding a new trial.
 
 B
 
 11
 Defendants next contend that the district court abused its discretion by admitting murdered eye-witness Roland Scott Harvey's preliminary hearing testimony in violation of their sixth amendment right to confrontation. At the preliminary hearing, Harvey was subjected to cross-examination by four of the six current defendants. Harvey testified that he was an insider and paid distributor in the defendants' cocaine distribution organization and testified regarding its organizational structure. Alternatively, defendants argue that, because all six were represented by only one attorney, conflicts of interest among the defendants prevented proper cross-examination of Harvey's preliminary hearing testimony with respect to individual defendants.
 
 
 12
 First off, that all six defendants did not, through their individual lawyers, have an opportunity to cross-examine Harvey during his preliminary hearing testimony is not fatal to admission of Harvey's testimony at trial. Even in the complete absence of cross-examination, the testimony of a declarant no longer available for trial is admissible so long as the prior recorded testimony has sufficient assurance of reliability. See United States v. West, 574 F.2d 1131, 1137 (4th Cir.1978). So long as there are "strong indicators of reliability, and the jury had an ample basis upon which to determine the trustworthiness of the testimony," United States v. Garner, 574 F.2d 1141, 1144 (4th Cir.1978), admission of prior recorded testimony does not violate the confrontation clause. See id. (admitting sworn grand jury testimony of unavailable witness).
 
 
 13
 Roland Scott Harvey testified under oath in state court and was subjected to vigorous cross-examination by counsel for four of the six defendants. Harvey's testimony was corroborated by numerous witnesses at trial who were themselves cross-examined concerning many of the same facts to which Harvey testified. See West, 574 F.2d at 1135 (although grand jury testimony of dead witness had not been subjected to immediate cross-examination, the testimony was nevertheless admissible because "to a large extent what [the declarant] said was corroborated by" other witnesses).
 
 
 14
 There was no error in admitting this evidence.
 
 C
 
 15
 Defendants next contend that, because the government peremptorily struck five of eight blacks but only three of thirty-three whites, the government violated the rule of Batson v. Kentucky, 476 U.S. 79 (1981). We review the district court's finding that the prosecutor's reasons for excluding the jurors were race-neutral as a finding of fact entitled to great deference. See Batson, 476 U.S. at 98 n. 21 (citing Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)).
 
 
 16
 To make out a prima facie Batson challenge, the defendant must first show that he is a member of a cognizable racial group and that the prosecutor excluded members of that race through peremptory challenges. See Batson, 476 U.S. at 96. The defendant may rely on the fact that peremptory challenges permit "those to discriminate who are of a mind to discriminate." Id. (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953)). Finally, the defendant must show that these facts, coupled with other relevant circumstances, raise an inference that the prosecutor excluded veniremen from the jury on the basis of race. Id. Once a defendant has made a prima facie showing, the burden shifts to the state to come forward with a neutral explanation for striking black jurors.
 
 
 17
 In the instant case, all six defendants are black. The jury as finally constituted consisted of four blacks and eight whites. Moreover, the prosecutor gave neutral reasons for each of the peremptory strikes. See J.A. 228, 229, 231, 1135. Finally, the government did not exhaust its peremptory challenges and could therefore have excluded more blacks than it did. See United States v. Dennis, 804 F.2d 1208, 1211 (11th Cir.1986) ("the unchallenged presence of two blacks on the jury undercuts any inference of impermissible discrimination.").
 
 
 18
 The district court properly found no violation of the Batson principle.
 
 III
 
 19
 We turn now to errors asserted by George and Crystal Harris.
 
 
 20
 * Defendants George and Crystal Harris challenge their conviction for aiding and abetting the cocaine distribution scheme in violation of 18 U.S.C. Sec. 2. They argue that the extent of their involvement in the conspiracy was to deposit checks or money orders which were proceeds of the cocaine distribution. Accordingly, they argue, because the only evidence of their involvement involves their activities after the cocaine sales had been made, George and Crystal Harris were guilty as accessories after the fact rather than aiders and abettors. Under 18 U.S.C. Sec. 2, "whoever ... aids, [or] abets" an offense against the United States is punishable as a principal. To the extent that George and Crystal Harris contend that they were, as a matter of law, improperly charged with aiding and abetting instead of accessory after the fact, this argument is totally devoid of merit. Section 2 abolishes the common law distinction between "principal" and "accessory." See United States v. Kegler, 724 F.2d 190, 200 (D.C.Cir.1984). Under the statute, the acts of the perpetrator become the acts of the aider and abettor, and the latter can be charged with having done the acts himself. See id.
 
 B
 
 21
 Crystal Harris contends that the district court clearly erred in finding by a preponderance of the evidence that Crystal reasonably foresaw death or serious bodily injury resulting from this drug distribution scheme such that a base offense level of 38 under Guidelines Sec. 2D1.1(a)(2) was unwarranted. The district court's determination of reasonable foreseeability is essentially factual and we must defer to the factfinding unless it is clearly erroneous. See United States v. Daughtrey, 874 F.2d 213 (4th Cir.1989).
 
 
 22
 Guidelines Sec. 2D1.4 requires that a defendant sentenced for conspiracy be sentenced, inter alia, only to the extent of those aspects of the conspiracy reasonably foreseeable to that defendant. Here, the evidence showed that the apartment from which the conspirators, including Crystal Harris, distributed cocaine was littered with drugs and weapons from which a reasonable factfinder could infer that Crystal foresaw death or great bodily harm to anyone who threatened the conspiracy. This is especially true after the first murder had already occurred. The district court's finding that Crystal foresaw the murders is not clearly erroneous.
 
 C
 
 23
 George Harris argues that the trial judge clearly erred in finding as a basis for departure from the guidelines that Harris was responsible for the three murders. The district court's findings concerning the large amount of cocaine distributed, the murder of three separate government witnesses, and Harris' status as the leader of the entire scheme are not clearly erroneous. Accordingly, upward departure under Guidelines Secs. 5K2.0 and 2.1 was proper. See Daughtrey, 874 F.2d 213.
 
 IV
 
 24
 The following issues are raised by defendants Johney and Gigi Freeman.
 
 
 25
 * Defendant Johney Freeman (Freeman) argues that the district court abused its discretion by admitting into evidence a Xerox copy of his drug ledger book. Evidence adduced at trial suggests that the evidence custodian destroyed the original after having used it in defendant Fencel Martin's state trial. In the instant case, a Norfolk police officer identified the copy as an exact copy of the ledger book seized during a search.
 
 
 26
 The copy of the ledger book was admissible under Fed.R.Evid. 1003 to the same extent as the original unless a genuine question is raised as to the authenticity of the original or if, under the circumstances, it would be unfair to admit the duplicate in lieu of the original. Johney Freeman bears the burden of demonstrating a genuine issue as to the trustworthiness of the duplicate. See United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir.1988). In the instant case, the Norfolk police officer authenticated the original and testified that the copy was an exact copy although he had not made a side-by-side comparison. Defendant Freeman raises no genuine issues as to the authenticity of the original; mere speculation that the document is not a duplicate of the original is insufficient to invoke a genuine question as to the original's authenticity. See id. Therefore, the court did not abuse its discretion in admitting the ledger. See id. (abuse of discretion standard).
 
 B
 
 27
 Johney Freeman next contends that the district court erroneously refused to grant his Rule 29 motion for acquittal because there was insufficient evidence to support his conviction under 21 U.S.C. Sec. 848 (the kingpin statute) of conducting a continuing criminal enterprise because he was merely a salaried employee. Freeman asserts that, because he drove old cars and because cocaine purchasers paid co-defendant Harris, there was insufficient evidence to show that he received a substantial source of his income from a continuing criminal enterprise. In reviewing a claim for sufficiency of the evidence, we must sustain the jury verdict if "substantial evidence, taking the view most favorable to the government, supports it." Glasser v. United States, 315 U.S. 60, 90 (1942). The relevant question is not whether we are convinced of guilt beyond reasonable doubts. Rather, it is whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond reasonable doubt. See United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982).
 
 
 28
 To be convicted under the kingpin statute the defendant must have acted in concert with five or more persons to whom the defendant occupied a supervisory or organizational position and obtained substantial income from this enterprise. Evidence adduced at trial showed that Freeman frequently flew from New York to Norfolk transporting cocaine. It is undisputed that five or more people were involved. Moreover, Freeman hired and fired associates in the organization, and appears to have conducted a substantial amount of the organizational work including arranging for murders. Finally, Johney Freeman had no legitimate employment throughout the relevant time frame, and received $1,000 every ten days for his work in the organization. The government need not prove a definite amount of profit; it is sufficient to show substantial gross income or gross expenditure for resources. See United States v. Dickey, 736 F.2d 571, 588 (10th Cir.1984). Thus, viewed in the light most favorable to the government, a rational factfinder could have found beyond reasonable doubt that Freeman occupied a supervisory or organizational position.
 
 C
 
 29
 In sentencing Johney Freeman, the district court imposed an upward departure which increased Freeman's sentence to life without parole. The district court based the upward departure on Guidelines Sec. 5K2.1 which specifically authorizes such departures when death results. The basis for the upward departure was that Freeman had been held responsible for two of the murders occurring during the life of the conspiracy.
 
 
 30
 Johney Freeman contends that, by relying upon inaccurate information at sentencing, a life sentence without parole for the crime of conducting a continuing criminal enterprise constituted cruel and unusual punishment such that Freeman's sentence was an abuse of the district court's discretion. His argument has four subparts: (1) the sentence was based upon the allegedly inadmissible testimony of Roland Scott Harvey; (2) the sentence was disproportionate; (3) the sentence was based upon unreliable and uncorroborated testimony; and (4) application of the guidelines was improper because Johney Freeman had withdrawn from criminal activity before the effective date of the guidelines.
 
 
 31
 As noted earlier, the district court properly allowed Roland Scott Harvey's preliminary hearing testimony and therefore we reject this portion of Johney Freeman's argument. Turning next to Johney Freeman's argument that his sentence was based upon unreliable and uncorroborated testimony, "the court of appeals shall give due regard to the opportunity of the district court to judge the credibility of witnesses and shall accept the findings of fact of the district court unless they are clearly erroneous...." 18 U.S.C. Sec. 3742. Although Johney Freeman points out that some of the witnesses against him were operating under a grant of immunity, and that others had in the past been admitted perjurers, we cannot substitute our judgment for that of the factfinder--in this case, the sentencing judge. In short, we find no clear error in the district court's assessment that the witnesses against Freeman were credible.
 
 
 32
 Johney Freeman's assertion that his sentence was disproportionate because the evidence against him was insufficient to support his culpability for the murders is similarly without merit. The evidence taken in the light most favorable to the government was more than adequate to support the finding that Freeman planned the murders. As noted earlier, under Sentencing Guidelines Secs. 5K2.0 and 5K2.1, upward departure is authorized inter alia where death results. In the instant case, Johney Freeman twice hired a contract killer to murder government witnesses. We find no abuse in the district court's exercise of his discretion to grant an upward departure pursuant to Guidelines Sec. 5K2.1.
 
 
 33
 Finally, adequate evidence supports the district court's finding that Johney Freeman was a member of the conspiracy beyond the effective date of the Guidelines and this finding is not clearly erroneous. The district court properly sentenced Freeman under the Sentencing Guidelines.
 
 D
 
 34
 Defendant Gigi Freeman alleges that a three to five-week variance between dates alleged in her indictment and the proof at trial prejudiced her ability to present an alibi defense. The indictments alleged overt acts "on or about October 18, 1986 ... [and] November 22, 1986," see Appellants' Br. at 19, in furtherance of a conspiracy alleged to have conducted a continuing pattern of criminal activity from January 1984 until May 1988. The government argues that the broad dates of the conspiracy count should have put Gigi on notice that evidence would be produced concerning anything occurring throughout this period.
 
 
 35
 A conviction must be vacated and the indictment dismissed when: (1) there was at trial a variance between the indictment and the proof; and (2) the variance prejudices a substantial right of the defendant. See United States v. Schurr, 775 F.2d 549, 553 (3d Cir.1985). Nevertheless, the government need only prove that illegal activity happened during a period of time reasonably related to the indictment dates. See United States v. Schocket, 753 F.2d 336, 341 (4th Cir.1985).
 
 
 36
 In the instant case, the critical inquiry is whether Gigi Freeman was prejudiced by the variance. See United States v. Morris, 700 F.2d 427, 430 (1st Cir.1983). We find no such prejudice to Gigi Freeman's alibi defense caused by a lack of precision in the indictment dates. Gigi Freeman's alibi witnesses provided Gigi with an alibi not just for the time alleged in the indictment, but also for the time in which her overt acts were proven at trial to have occurred. It therefore appears that the jury simply chose not to credit Gigi's alibi witnesses.
 
 E
 
 37
 Gigi Freeman next contends that, because of the prejudicial force of testimony incompetent as to her but competent as to other co-defendants, the district court abused its discretion by refusing to sever her trial from that of her co-conspirators. Specifically, Gigi Freeman cites prejudice from spill-over evidence concerning murders, attempted murders, and threats with which Gigi Freeman had "only dubious" connection. Gigi Freeman also contends that her inability to question co-defendants prejudiced her ability to prove her innocence.
 
 
 38
 Persons properly joined in an indictment should ordinarily be tried together, particularly if conspiracy is charged. See United States v. Parodi, 703 F.2d 768, 779 (4th Cir.1983). Where a demand for severance is based on the disproportionate amount of testimony dealing with other co-conspirators, severance may not be granted without a strong showing of prejudice. See United States v. Brugman, 655 F.2d 540, 543 (4th Cir, 1981) (despite being named in only three of eighteen counts proved at trial, co-conspirator was properly denied a motion for severance). We find that Gigi Freeman has failed to make the strong showing of prejudice required to justify severance.
 
 
 39
 As to Gigi's asserted need for her co-defendants' testimony, Parodi, 703 F.2d at 779, set forth the criteria for granting a motion for severance based on asserted need for a co-defendant's testimony. One of the criteria is that the defendant must show the exculpatory nature and effect of the co-defendant's testimony. See id. A substantial amount of evidence supported the jury's finding that Gigi Freeman was heavily involved in the distribution of cocaine for this organization. Other than a conclusory allegation that inability to question her co-conspirators prejudiced her, Gigi fails to allege what exculpatory evidence she might derive from her co-defendants. Therefore, based on Parodi, the court did not abuse its discretion by denying Gigi severance.
 
 F
 
 40
 Gigi next argues that the government failed to prove its case against her beyond reasonable doubt because of the character of government witnesses linking her to criminal activity. Appellants' Br. at 26. Again, the applicable standard of review requires that we sustain the verdict if substantial evidence, taking the view most favorable to the government, supports it. Glasser, 315 U.S. at 90; Tresvant, 677 F.2d at 1021.
 
 
 41
 The two government witnesses who testified to Gigi's involvement were immunized co-conspirators. Nevertheless, the credibility of witnesses is solely a jury question and is not reviewable. Pigford v. United States, 518 F.2d 831, 836 (4th Cir.1975). Thus, taking the testimony implicating Gigi in the light most favorable to the government, a rational factfinder could have found her guilty.
 
 G
 
 42
 Gigi Freeman finally argues that the sentencing judge improperly applied the sentencing guidelines. The trial judge fixed Gigi's offense level at 38 based upon Guidelines Sec. 2D1.1(a)(2), which requires an offense level of 38 for a drug offense resulting in death or serious bodily harm. Gigi argues that this was improper because she did not actively participate in death-causing activity. Gigi Freeman's lack of active involvement in the violence is irrelevant. What is relevant was whether she could reasonably foresee such violence, and there is ample evidence in the record that she could. Therefore, the district court's finding that Gigi could reasonably foresee death or great bodily harm was not clearly erroneous. Moreover, the district court accounted for Gigi's lack of knowledge of or active participation in the murders through a four-level decrease, presumably pursuant to Guidelines Sec. 5K.
 
 V
 
 43
 The following issues are raised by defendants Fencel Martin and Carolyn Lee Patterson.
 
 
 44
 * Martin argues that, because the only witness able to testify against him regarding the cocaine sale alleged in Count 54 of the indictment could not identify Martin in court, there was insufficient evidence to sustain the jury's conviction. This witness, Yuengert, testified that "Festus" sold him cocaine. Other witnesses testified that "Festus" was Fencel Martin. Substantial evidence independent of that elicited from Yuengert supports a finding that Martin played a major role in the conspiracy. As to the particular sale of cocaine alleged in Count 54, even though Yuengert did not identify Fencel Martin in open court, Fencel Martin's brother Selwyn testified that Selwyn and Fencel had sold cocaine as recently as the month prior to the sale alleged in count 54. The credibility of Yuengert's identification is matter solely within the jury's province. See Pigford v. United States, 518 F.2d 831, 836 (4th Cir.1975). When coupled with Selwyn Martin's testimony concerning sales made with his brother Fencel, a rational factfinder could have found Fencel guilty beyond reasonable doubt.
 
 B
 
 45
 Fencel Martin next argues that he was improperly classified as a career offender because one of his prior convictions occurred pursuant to the instant conspiracy.
 
 
 46
 Under Guidelines Sec. 4B1.1, a defendant is a career offender if the defendant was at least 18 years old at the time of the offense, the offense is, inter alia, a drug offense, and the defendant had at least two prior convictions. Martin was convicted in 1983 for possession of cocaine with intent to distribute, and again in 1985 for conspiracy to violate the drug act. Martin argues that his 1985 conviction in Virginia state court was for acts conducted while a member of the instant conspiracy and therefore may not be used as one of the two felony offenses.
 
 
 47
 The evidence shows that, upon release from the Virginia state penitentiary, Martin resumed activity in the conspiracy. Indeed, the overt act alleged in Count 54 against Fencel Martin for which he was found guilty occurred after his release from prison. There is ample evidence showing Martin to have rejoined the conspiracy after his release from prison. Coupled with his 1983 conviction, the Virginia conspiracy could be counted as one of the two convictions by which the court could properly assign career offender status to Martin.
 
 C
 
 48
 Martin finally argues that, because he was in jail when the murders occurred, the district court erred in finding the murders foreseeable such as to result in an offense level of 38 under Sec. 2D1.1(a)(2) (providing for an offense level of 38 for drug offenses resulting in death). Based upon Martin's classification as a career offender, Martin's offense level would be 37 in the event the court erred in assigning him an offense level of 38 under Sec. 2D1.1(a)(2). The sentencing range is exactly the same for an offense level of 37 or 38 for a criminal history category of VI--360-life. The trial judge imposed upon Martin the minimum sentence--360 months--and therefore Martin suffered no harm.
 
 VI
 
 49
 Patterson argues that a two-level increase under Guidelines Sec. 3B1.1(c) for her aggravating role in the conspiracy was unwarranted because she was only peripherally involved in the conspiracy. The district court based its finding that Patterson's role was aggravating upon Patterson's "high relative culpability" in the drug distribution scheme. Evidence adduced at trial revealed that she distributed and received payment for cocaine. The district court's finding of high relative culpability is not clearly erroneous and we therefore uphold imposition of the two-point increase for Patterson's aggravating role.
 
 
 50
 AFFIRMED.
 
 
 
 [1]
 Judge Haynsworth participated in the hearing of this case by listening to the recorded oral arguments but died prior to the time the decision was filed. The decision is filed by a quorum of the panel. 28 U.S.C. Sec. 46(d)
 
 
 [2]
 Aware of the Hobson's choice jury polling presented, the defendant understandably refused the jury poll